IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JOHN CARPENTER,                    )
                                   )        No. C 06-7408 JSW (PR)
            Petitioner,            )
                                   )        ORDER DENYING PETITION
    vs.                            )        FOR A WRIT OF HABEAS
                                   )        CORPUS
SCOTT KERNAN, Warden,              )
                                   )
            Respondent.            )
_____    )

**INTRODUCTION**

Petitioner, John Carpenter, is a state prisoner currently incarcerated at the California State Prison, Solano, in Vacaville, California.  Petitioner filed this *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2254, alleging ineffective assistance of trial counsel in violation of the Sixth Amendment, insufficient evidence supports his conviction in violation of the Fourteenth Amendment, and ineffective assistance of appellate counsel in violation of the Sixth Amendment.  This Court found that the petition, when liberally construed, stated a cognizable federal claim and ordered Respondent to show cause why a writ of habeas corpus should not be granted.  Respondent filed an answer.  Petitioner has not filed a traverse.  This *pro se* habeas petition is now before the Court for consideration on the merits.  For the reasons discussed below, the petition is denied.

## PROCEDURAL BACKGROUND

On May 13, 2003, Petitioner was convicted by a jury in Alameda County Superior Court of first degree murder, a violation of California Penal Code section 187.  Cal. Penal Code § 187.  On August 1, 2003, Petitioner was sentenced by the trial court to 25 years to life in state prison.  The California Court of Appeal affirmed Petitioner's conviction on October 15, 2004, and the California Supreme Court denied review on December 22, 2004.  On December 5, 2005, the Alameda County Superior Court denied Petitioner's habeas corpus petition.  The California Court of Appeal denied Petitioner's direct appeal on January 12, 2006 and the California Supreme Court denied review on September 27, 2006.  Petitioner filed the instant federal petition for a writ of habeas corpus on December 4, 2006.

## FACTUAL BACKGROUND

The facts underlying the charged offenses, as found by the California Court of Appeal, are summarized in relevant part, as follows:

> Defendant was charged with the murder of Ignacio Barba.  [. . .]
> Barba was a known drug dealer who had sold drugs to defendant's cousin, Rickie Campbell, on numerous occasions.  Barba usually met Campbell at Big John's Car Stereo Installation (Big John's) on 81st Avenue in Oakland, which was owned and operated by defendant.  Barba's fiancee, Lorena Perez, had been to Big John's with Barba several times when he went to meet with Campbell.  On three or four occasions she had seen defendant at the shop. Defendant had also come to her house to fix the speakers in her truck.  Perez's brother also testified that he had accompanied Barba to Big John's to meet with Campbell on five or six occasions, and that defendant was there on most of those visits.
>
> Perez testified that on September 2, 1999, Barba was involved in a large drug deal with Campbell.  That morning, she had seen at Barba's apartment 15 packages of cocaine wrapped in black plastic and duct tape, some in a gym bag and some in a laundry bag. Barba told her that he was going to deliver half of the cocaine to Campbell at Big John's in the morning, and when Campbell could pay for that he would deliver the other half.
>
> Later that day, around noon, Barba came to Perez's house, where

2

he washed her truck.  Gustavo Curiel, who was outside with Barba as he was washing the truck, testified that Campbell came by Perez's house and had a brief conversation with Barba.  Later Curiel accompanied Barba to Big John's.  Defendant arrived at the store as they pulled up.  Barba did not bring anything into the store and did not return to the car carrying anything.  On the way back to Perez's house, Barba told Curiel that he was going to do some business and invited Curiel to join him, but Curiel declined and went home.  Perez testified that she last saw Barba at her house that afternoon when he said he was going to Big John's to see Campbell about the money for the cocaine he had given him earlier in the day.  Barba left driving her truck.  About two hours later, Perez began calling and paging Barba but he did not return her call.  Around 11:00 p.m., she drove past Big John's, and saw a light under the door but did not see anyone or her truck.  She went back to Big John's again after midnight, and found the fire department there.

The fire department had been called about 1:30 a.m. on September 3, by someone reporting a fire at Big John's.  Just prior [at 1:18 a.m.], defendant had called the police and reported there had been a robbery at his shop.  He explained he had opened the door after hearing some knocking, and that four intruders entered, put a gun to his head and tied him with duct tape.  After about 20 minutes he untied himself and ran to a local fast food restaurant to call the police.  When the police arrived defendant had pieces of duct tape on his mouth, wrists and pants.  His tee shirt was torn and he appeared to have an abrasion on his chest.  Defendant told the police he had not smelled or seen smoke or fire before he left the shop.  Fire inspectors later determined the fires were caused by arson.

On September 7, 1999, Ignacio Barba's body was found decomposing in the back of Perez's truck.  Barba's wrists were bound with black wire, plastic lock-ties, and gray duct tape.  Stereo wire was knotted loosely around Barba's neck.  Defendant's fingerprint was found on the duct tape binding Barba's ankles.  Investigators also found defendant's bloody fingerprint on the bumper of the truck.  An autopsy determined that the condition of the body was consistent with death on September 2 or 3.

Officers searched Barba's residence but did not find any drugs or cash.  They did find pay sheets with the name Rick followed by entries for $ 27,000 and $ 28,000.  Officers also searched defendant's store, seizing among other things stereo wires and black plastic pull-ties.  Trace amounts of blood that was consistent with Barba's DNA profile was found on the stairs in the shop.  Defendant was arrested for Barba's murder on April 4, 2000.

Almost a year later, on March 4, 2001, Latwaun Mercy was arrested on an unrelated drug offense.  At that time he told the arresting officer that he did not want to go to jail and offered the

officers information about Barba's murder.  In an initial unrecorded interview, Mercy described seeing Barba at Big John's on the night of his death.  He was already dead and taped to a chair when Mercy arrived.  In a subsequently recorded statement, Mercy told police that on the night of September 2, he and his cousin had gone to the Sound Factory to pick up two large duffel bags of cocaine from a man named Juan.  They delivered the bags to Campbell and defendant at Big John's.  When he went upstairs he saw Barba in a chair. Barba was unconscious, bloody and had duct tape around his mouth, legs and arms.  The men divided the cocaine and then Mercy and his cousin left.  At trial, Mercy repudiated his prior statements and denied having any knowledge relevant to the case.  The above was admitted as a prior inconsistent statement.

*People v. Carpenter*, No. A103541, 2004 WL 2326392 (Cal. App. 1st Dist., October 15, 2004), at *1-2.

## STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court may entertain a petition for habeas relief "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  The writ may not be granted unless the state court's adjudication of any claim on the merits: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* at § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if a state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-12 (2000).  "Under the 'unreasonable application'

4

clause, a federal habeas court may grant the writ if a state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

In deciding whether the state court's decision is contrary to, or an unreasonable application of clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision. *LaJoie v. Thompson,* 217 F.3d 663, 669 n.7 (9th Cir. 2000). If the state court only considered state law, the federal court must ask whether state law, as explained by the state court, is "contrary to" clearly established governing federal law. *See*, e.g., *Lockhart v. Terhune*, 250 F.3d 1223, 1230 (9th Cir. 2001); *Hernandez v. Small*, 282 F.3d 1132, 1141 (9th Cir. 2002)(state court applied correct controlling authority when it relied on state court case that quoted Supreme Court for proposition squarely in accord with controlling authority).

However, the standard of review under AEDPA is somewhat different where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim. In such a case, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable. *See Plascencia v. Alameida*, 467 F.3d 1190, 1197-98 (9th Cir. 2006); *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Greene v. Lambert*, 288 F.3d 1081, 1088 (9th Cir. 2002); *Bailey v. Newland*, 263 F.3d 1022, 1028 (9th Cir. 2001); *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). When confronted with such a decision, a federal court should conduct "an independent review of the record" to determine whether the state court's decision was an objectively unreasonable application of clearly established federal law. *Plascencia*, 467 F.3d at 1198;

1  *Himes*, 336 F.3d at 853; *Delgado*, 223 F.3d at 982; *accord Lambert v. Blodgett*,

2  393 F.3d 943, 970 n.16 (9th Cir. 2004).

3          The federal court need not otherwise defer to the state court decision

4  under AEDPA: "A state court's decision on the merits concerning a question of

5  law is, and should be, afforded respect.  If there is no such decision on the merits,

6  however, there is nothing to which to defer."  *Greene*, 288 F.3d at 1089.  In sum,

7  "while we are not required to defer to a state court's decision when that court

8  gives us nothing to defer to, we must still focus primarily on Supreme Court

9  cases in deciding whether the state court's resolution of the case constituted an

10  unreasonable application of clearly established federal law."  *Fisher v. Roe*, 263

11  F.3d 906, 914 (9th Cir. 2001).  *But cf. Brazzel v. Washington*, 491 F.3d. 976, 981

12  (9th Cir. 2007) (noting that when state court reaches decision on merits but does

13  not supply reasoning for its decision, federal court reviews the record to

14  determine if there was clear error); *Larson v. Palmateer*, 515 F.3d 1057, 1062

15  (9th Cir. 2008) (quoting *Brazzel*, 491 F.3d at 981, for rule that if "state court

16  reaches the merits without providing reasoning for us to review, however, 'we

17  independently review the record to determine whether the state court clearly

18  erred in its application of Supreme Court law.'")

19                                    **DISCUSSION**

20          In this petition for a writ of habeas corpus, Petitioner alleges that there

21  was insufficient evidence to support his conviction.  Petitioner also alleges

22  ineffective assistance of counsel based on the failure of his defense attorney to:

23  (1) suppress the testimony of witness Latwaun Mercy, (2) properly cross-

24  examine the prosecutor's expert witnesses, (3) call a DNA and fingerprint expert,

25  (4) object to the prosecutor's remarks during the closing argument, and (5)

26  investigate an "angry statement" made by a witness.  Furthermore, Petitioner

27

28                                        6

claims the overall strategy by his defense attorney was improper. Finally, Petitioner alleges ineffective assistance of his appellate counsel based on the failure of his appellate attorney to challenge: (1) the sufficiency of evidence and (2) the ineffective assistance of his trial counsel.

## I.   **Sufficiency of Evidence.**

Petitioner challenges the sufficiency of evidence to sustain his conviction for first degree murder of Barba. Specifically, Petitioner claims that the prosecution failed to prove that the blood found in Petitioner's home belonged to Barba, that Barba was actually robbed or that Petitioner actually beat Barba.

### A.   **Legal Standard**

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). In reviewing a habeas petition for a prisoner who alleges insufficiency of evidence to support his conviction, the federal court must determine whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

 If confronted by a record that supports conflicting inferences, a federal habeas court "must presume – even if it does not affirmatively appear on the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326. A jury's credibility determinations are therefore entitled to near-total deference. *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004). Except in the most exceptional of circumstances, *Jackson* does not permit a federal habeas court to revisit credibility determinations. *See id.* (credibility contest between victim alleging

sexual molestation and defendant vehemently denying allegations of wrongdoing not a basis for revisiting jury's obvious credibility determination); *see also People of the Territory of Guam v. McGravey*, 14 F.3d 1344, 1346-47 (9th Cir. 1994) (upholding conviction for sexual molestation based entirely on uncorroborated testimony of victim).

Where behavior is consistent with both guilt and innocence, the burden is on the State to produce evidence that would allow a rational trier of fact to conclude beyond a reasonable doubt that the behavior was consistent with guilt. *Sarausad v. Porter*, 479 F.3d 671, 678 (9th Cir. 2007). However, the prosecution need not affirmatively rule out every hypothesis except that of guilt. *Wright v. West*, 505 U.S. 277, 296-97 (1992) (quoting *Jackson*, 443 U.S. at 326); *see, e.g., Davis v. Woodford*, 384 F.3d 628, 639-41 (9th Cir. 2004) (finding sufficient evidence of premeditation). The existence of some small doubt based on an unsupported yet unrebutted hypothesis of innocence therefore is not sufficient to invalidate an otherwise legitimate conviction. *See Taylor v. Stainer*, 31 F.3d 907, 910 (9th Cir. 1994) (three hypotheses regarding petitioner's fingerprints which government failed to rebut unsupported by evidence and therefore insufficient to invalidate conviction).

Where a state court does not reach the merits of a habeas claim, the federal habeas court must review the claim de novo. *See Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002). Because the California Supreme Court did not issue a decision on the merits of this claim, this Court reviews it de novo.

### B.     Analysis

The issue here is whether, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact" could have convicted Petitioner of the murder of Barba under California Penal Code § 187. *See*

8

1    *Jackson*, 443 U.S. at 319.  A careful review of the record establishes that

2    Petitioner is not entitled to habeas relief on this claim.

3            The totality of the evidence was sufficient for a jury to convict Petitioner

4    of first degree murder.  Petitioner's argument in support of his claim focuses on

5    the probative value of the evidence, not its legal sufficiency.  The crime of first

6    degree murder under California law is defined as the unlawful killing of a human

7    being with malice aforethought, which is perpetrated by "any kind of willful,

8    deliberate, and premeditated killing, or which is committed in the perpetration of,

9    or attempt to perpetrate [. . .] robbery [. . .] or [certain other crimes]."  Cal. Penal

10   Code § 187.

11           This Court finds that the record does not support Petitioner's contention

12   that the evidence was insufficient to prove Petitioner's involvement with Barba's

13   slaying.  Instead, the evidence establishes Petitioner's deliberation, planning, and

14   malice aforethought in the murder of Barba.  Evidence presented at trial included

15   direct testimony, forensic evidence and a suspicious fire, all linking Petitioner to

16   Barba's death.

17           Through direct testimony it was established that Barba was on his way to

18   Petitioner's shop on the day he disappeared.  Reporter's Transcript ("RT") at

19   174, 1248.  Testimony from Lorena Perez established that the purpose of Barba's

20   trip to Petitioner's shop was to deliver fifteen packages of cocaine Perez had seen

21   that day.  *Id.* at 191, 196.  When Barba did not return that evening, Perez

22   searched Barba's apartment and other vehicles but did not find any cash or drugs.

23   *Id.* at 198-200.  On the same night as his disappearance, Latwaun Mercy saw

24   Petitioner at his shop in the same room as Barba, who was bound to a chair with

25   duct tape and covered in blood.  *Id.* at 669, 671, 671-672.  Mercy testified that he

26   was present at Petitioner's shop to get a cut of fifteen kilos of cocaine.  *Id.* at

27

28                                              9

673.  A jury reasonably could have found that Petitioner robbed Barba even though no drugs or money was recovered, given this testimony at Petitioner's trial.  It was the prosecution's contention that the evidence supported this finding, *see id.* at 1499-1500; 1501-03, and there was sufficient evidence offered at trial to support this conclusion by the jury.

On September 7, Barba's body was discovered in Perez's white Chevy Tahoe.  *Id.* at 476, 273, 364.  Barba was found bound with black wire, "black plastic lock-type ties," and gray duct tape.  *Id.* at 279, 368, 371.  Barba's body had several lacerations about the head and no defensive wounds.  *Id.* at 389, 391.  Cause of death was determined to be death following multiple blunt injuries to the head.  *Id.* at 394.  A forensic pathologist testified that a death of September 2 or September 3 would be within the range of when the death occurred.  *Id.* at 396.  Furthermore, the pathologist testified that the lacerations would have bled and there was a strong possibility of blood splatter.  *Id.* at 395.

Strong forensic evidence connected Petitioner to Barba's death.  First, an investigation of Petitioner's shop found blood splatter on the stair runner.  *Id.* at 756, 795, 1172.  Barba could not be excluded as a source of the blood found on the stair runner.  *Id.* at 1187.  A search of the room above Petitioner's shop, where Petitioner lived, also found black plastic pull ties and speaker wire.  *Id.* at 806, 809.

Second, four strips of duct tape were taken from Barba's body.  *Id.* at 859.  From these pieces, three prints were developed, all from the nonadhesive side and all from the same strip.  *Id.* at 863.  Two identifications were made from prints on duct tape.  *Id.* at 1066; 1070.  One print was made by Petitioner's right middle finger.  *Id.* at 1072.  The other was determined to be Petitioner's right palm print.  *Id.* at 1073.  The prints were going in the same direction - horizontal

10

to the tape. *Id.* at 1075.

Third, blood smearing belonging to a human and that was consistent with Barba's blood, but too small a sample to test affirmatively, was found on tailgate of the Tahoe. *Id.* at 822, 1183, 1184. On the front chrome bumper, visible fingerprints were found. *Id.* at 824. Two prints were lifted. *Id.* at 843. Anne Jancse, a criminalist for the Oakland Police department, testified that one of the prints found on the bumper was Petitioner's right middle finger. *Id.* at 1023, 1047. Jancse testified that the prints were consistent with the Petitioner having blood on his fingers when he touched the bumper. *Id.* at 1059. Moreover, on the day he disappeared, testimony established that Barba had washed the Tahoe. *Id.* at 193, 295. Jancse testified that, due to the fragility of fingerprints, any water, with any kind of pressure, being applied to the bumper would destroy any fingerprints. *Id.* at 1060.

Finally, a suspect fire at Petitioner's shop evidenced his involvement. At 1:18 a.m. in the morning following Barba's disappearance (September 3), Petitioner called 911 to report that he'd been robbed. *Id.* at 519. Petitioner claimed that he'd been robbed at gunpoint and taped up but broke loose. *Id.* at 519-520. He indicated that it took him 15-20 minutes to break loose. *Id.* at 520. Petitioner also signed a written statement that it took him 20-30 minutes to free himself. *Id.* at 497, 499. He told officers he then got in his van and drove away, calling 911 from a payphone at a nearby establishment. *Id.* at 338, 519, 522.

An examination of Petitioner's version of events leads to several inconsistencies. First, neighbor Matt Degregorio testified that Petitioner told him that his robbers had "poured gas and left him . . . to die." *Id.* at 1294. No such statement was told to police by Petitioner. *See id.* at 497-499. Degregorio also testified that when he approached the Petitioner, a third party whom he could not

identify, was standing next to Petitioner. *Id.* at 1291.  Degregorio testified that he asked Petitioner how he had gotten out of the shop and the third party told Degregorio that he (the third party) had heard Petitioner banging on the door and got the Petitioner out. *Id.* at 1291, 1296.  Petitioner, who heard the exchange, nodded in response. *Id.* at 1296.  This version of events is inconsistent with the report Petitioner made with police and in fact, the officer that interviewed Petitioner testified that Petitioner's story changed often. *Id.* at 339-340.

Second, Petitioner drove a distance to call 911 by payphone, but Julie Jaecksch, a police evidence technician, tested the payphone near Petitioner's home and shop and found it was working. *Id.* at 263, 264-65.  Third, three pieces of duct tape were found hanging on Petitioner's body when police arrived. *Id.* at 326, 489, 945.  Jaecksch testified to collecting all the duct tape from Petitioner's body shortly after 2:00 a.m. *Id.* at 243, 252-53, 255.  Yet when John Blatt, Petitioner's landlord, arrived at Petitioner's home after 7:30 a.m., Petitioner was wearing duct tape on his arms and legs. *Id.* at 582, 593, 595.

Fourth, shortly after Petitioner's 911 call, at 1:27 a.m., police received reports that Petitioner's shop was on fire. *Id.* at 524.  But when Petitioner was on the phone with 911 he didn't mention a fire. *Id.* at 519-522.  Nor did Petitioner mention a fire when he was interviewed by officers, he didn't mention a fire. *Id.* at 501.  Petitioner also told officers that he did not smell or see any smoke when he left. *Id.* at 1355.

Fifth, even though Petitioner told responding officer Jung Chang in a written statement it took him 20-30 minutes to free himself, he was not aware of a fire or of any smoke when he left his shop. *Id.* at 340, 341, 499, 501-502.  Yet, according to a Marlon Brandle, a fire investigator, there were three separate points of origin of the fire - two fires upstairs and one downstairs in an

12

automobile.  *Id.* at 903-904, 913, 914.  Each point was separate and independent and was started with some type of flammable liquid.  *Id.*  Brandle testified that smoke would have been produced instantly after the fire was set and would have filled the warehouse within minutes.  *Id.* at 922.  He also testified that it would be impossible to be in the building for 20 minutes and not know of or detect the smoke.  *Id.* at 923.  In fact, he stated it would have been impossible to be in building for even five minutes.  *Id.*

The forensic evidence and setting of a suspicious fire are consistent with the prosecutor's argument that Petitioner attempted to hide the evidence of Barba's demise through setting the fire and reporting his own victimization to police.  This Court finds that the conviction is supported by evidence sufficient to prove the elements of the crimes beyond a reasonable doubt.  *See* 28 U.S.C. § 2254(d)(1); *In re Winship*, 397 U.S. at 365-68; *Jackson*, 443 U.S. at 319.  It does not matter that much of the evidence was circumstantial because it is well established that "circumstantial evidence and inferences drawn from the evidence are sufficient to sustain a conviction."  *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995).  It is also well established that in a federal habeas corpus proceeding, deference must be given to the state law interpretation of the substantive elements of a state offense.  *Jackson*, 443 U.S. at 324 ("The standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law.").

The fact that the cause of death could not be definitively established or that no one saw Petitioner committing the acts that resulted in Barba's death does not mean that the evidence is inconsistent with the verdict.  When the mass of direct and circumstantial evidence implicating Petitioner is considered, the Court finds ample basis to support the state court's determination that any rational trier

of fact could have found Petitioner guilty beyond a reasonable doubt.  *See*

*Maass*, 45 F.3d at 1358.

## II.      Ineffective Assistance of Trial Counsel.

### A.      Legal Standard

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *see Williams (Terry) v. Taylor*, 529 U.S. 362, 404-08 (2000).  The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result.  *Strickland*, 466 U.S. at 686.

In order to prevail on a Sixth Amendment ineffective assistance of counsel claim, Petitioner must establish two things.  First, *Strickland* requires Petitioner to show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment.  *See Strickland*, 466 U.S. at 687.  The defendant must show that counsel's representation fell below an objective standard of reasonableness.  *See id.* at 688.  The relevant inquiry is not what defense counsel could have done, but rather whether the choices made by defense counsel were reasonable.  *See Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998).  Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  *See Strickland*, 466 U.S. at 689.

Second, Petitioner must establish that he was prejudiced by counsel's

deficient performance and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *Id.*

It is unnecessary for a federal court considering a habeas ineffective assistance claim to address the prejudice prong of the *Strickland* test if the petitioner cannot even establish incompetence under the first prong.  *See Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998).  However, here there is no indication that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  The burden to prove prejudice rests with the petitioner.  *Id.* at 693.

**B.     Analysis**

**1.     Failure to suppress the testimony of Mercy**.

Petitioner claims that his defense counsel was ineffective for failing to suppress the testimony of Latwaun Mercy as he did not meet the "required standard for an informant witness."[1]  Additionally, Petitioner claims his defense counsel should have sought suppression of Mercy's statements because Mercy had his charges dropped after making his statements, was not read his *Miranda* rights and was given information regarding the murder from the police.[2]

---

[1]Although Petitioner has not laid his claim on any particular constitutional ground, construing the claim liberally, the Court has considered Petitioner's contention that Mercy may have had a preexisting agreement with authorities and was thus acting as a government agent, as well as whether admission of Mercy's statements violated his Sixth Amendment confrontation rights.

[2]Respondent's Answer addresses these claims as a failure to challenge Mercy's statements on the grounds that they were coerced or involuntary. Respondent's Answer at 6.  For the purposes of this habeas petition, and because Petitioner filed no Traverse to clarify his assertions, this court examined these

15

"To show prejudice under *Strickland* resulting from the failure to file a motion, a defendant must show that (1) had his counsel filed the motion, it is reasonable that the trial court would have granted it as meritorious, and (2) had the motion been granted, it is reasonable that there would have been an outcome more favorable to him." *Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 373-374 (1986) (so stating with respect to failure to file a motion to suppress on Fourth Amendment grounds)); *see also Van Tran v. Lindsey*, 212 F.3d 1143, 1156-57 (9th Cir. 2000) (no prejudice suffered as a result of counsel's failure to pursue a motion to suppress a lineup identification), overruled on other grounds by *Lockyer v. Andrade*, 538 U.S. 63 (2003).

Mercy was arrested on March 4, 2001 for possession of narcotics. RT at 646, 647, 654, 1232, 1327-1328, 1330. On that day Mercy made a tape-recorded statement to Sergeant Jeffery Ferguson and Sergeant Brian Medeiros regarding Petitioner's involvement in the murder of Barba. *Id.* at 656-692; Ex. 66, 66A. Mercy also identified Petitioner through a photo line-up. RT at 690, 696, 1332; Ex. 60. Mercy later reiterated his earlier statement to Inspector Jack Huth of the Alameda County District Attorney's Office on April 8, 2003. RT at 1225, 1231.

When first called to testify at trial, Mercy answered a few preliminary questions. *Id.* at 536. From that point on, Mercy denied knowledge or recollection on questioning by the prosecutor, at one point explaining that he could not remember meeting with the prosecutor because he was high at the time. *Id.* at 537-545. Mercy also stated that he did not want to testify. *Id.* at 547.

On cross-examination, Mercy testified that the police had lied and manipulated him by giving him information about the case. *Id.* at 633. Mercy

_____

claims through an independent examination of the record.

denied all of the statements made on the tape-recorded interview.  *Id.* at 635-641.

Mercy also testified that his Miranda rights were not read to him when he first

spoke to police.  *Id.* at 635.  However, Mercy testified that he was not told to

give testimony in exchange for leniency on his own drug case and did not ask for

such.  *Id.* at 633, 634.  The court admitted Mercy's tape-recorded interview into

evidence as prior inconsistent statements under California Evidence Code section

1235.  *Id.* at 655.

When a declarant appears for cross-examination at trial, the Confrontation

Clause places no constraints at all on the use of his or her prior testimonial

statements.  *California v. Green*, 399 U.S. 149, 157 (1970); *see Crawford v.*

*Washington*, 541 U.S. 36 (2004).  Here, Mercy testified at trial and was subject

to cross-examination regarding his previous inability or unwillingness to testify.

RT at 630-641.  Thus, the admission of Mercy's prior statements to Sergeants

Ferguson and Mederios did not violate Petitioner's rights under the Confrontation

Clause.  *See California*, 399 U.S. at 162 ("where the declarant is not absent, but

is present to testify and to submit to cross-examination, our cases, if anything,

support the conclusion that the admission of his out-of-court statements does not

create a confrontation problem"); *Delaware v. Fensterer*, 474 U.S. 15, 21-22

(1985) ("the Confrontation Clause is generally satisfied when the defense is

given a full and fair opportunity to probe and expose . . . infirmities through

cross-examination, thereby calling to the attention of the factfinder the reasons

for giving scant weight to the witness' testimony").  Because there is no violation

of the right to confrontation when the declarant is available for

cross-examination, Petitioner is not entitled to relief on these claims.

Nor does this Court find any merit to the argument that Mercy was acting

as an informant or government agent when he spoke to police.  *See United States*

17

*v. Busby*, 780 F.2d 804, 807 (9th Cir. 1986) (a person does not become a government agent until his activities are under the direction and supervision of law enforcement officers.  No "agency relationship" is created simply because the informant expects to be rewarded for his conduct); *see also United States v. Love*, 134 F.3d 595, 604 (4th Cir. 1998) ("The behavior of an informant who initiates contact with an indicted defendant -- whether because of conscience, curiosity, or even potentially to curry an unpromised future favor from the government -- cannot be attributed to the government.").        Sergeant Mederios testified that Mercy likely wanted a benefit for his statement, while Sergeant Ferguson testified that it is common for police to give a person a break on a case in exchange for information.  RT at 654, 1330.   However, both testified that Mercy didn't ask for such a favor.  *Id.* at 703, 1330.  Finally, Sergeant Mederios testified that Mercy was not given a promise of leniency either.  *Id.* at 1340.  In the end, charges were dropped against Mercy.  *Id.* at 1330, 1331.  So while the record shows that although he did hope to benefit from testifying, Mercy had no such agreement.  The evidence adduced at trial did not reveal that Mercy was a government agent, and Petitioner has not met his burden to show as much. Because Mercy was not a government agent, Mercy's statements are not subject to suppression on the grounds asserted.  Accordingly, trial counsel was not ineffective in failing to file a motion to suppress.  *See Lowry v. Lewis*, 21 F.3d 344, 346 (9th 1994) (finding that counsel is not ineffective for failing to file frivolous motions).

　　　In regards to Petitioner's other causes for suppression, there is no merit to Petitioner's claims.  Both Sergeant Ferguson and Sergeant Mederios testified that Mercy was read his Miranda rights prior to their interview.  RT at 650, 700, 1329.  Mercy confirmed receiving his Miranda rights in his taped interview.  *Id.*

at 658.  Additionally, both Sergeant Ferguson and Sergeant Mederios also testified that Mercy was not told any information about the case.  *Id.* at 652, 653-654, 713, 1334-1335.  As Mercy's statements were not coerced or obtained in violation of Miranda, any objection to Mercy's statements would have been futile.  *Strickland* does not obligate counsel to make a meritless argument.  *See Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996); *Shah v. United States*, 878 F.2d 1156, 1162 (9th Cir.), cert. denied, 493 U.S. 869 (1989).

Given that it would have been futile for Petitioner's counsel to bring a suppression motion, there is no reasonable probability that, had the motion been brought, the result of the proceeding would have different.  *Strickland*, 466 US at 693-94.  Further, Petitioner cannot show that it is reasonable that there would have been an outcome more favorable to him even if the court had suppressed Mercy's testimony.  Mercy was just one witness who implicated Petitioner in committing the murder.  Further, the incriminating testimony of several other witnesses as well as significant physical evidence, as seen above in Part I, implicated Petitioner in the murder.  There is no reasonable probability that but for the failure to suppress Mercy's testimony, the outcome would have been different.  Accordingly, Petitioner's claim must be denied.

### 2.   Failure to properly cross-examine the prosecutor's witnesses.

Petitioner asserts that his counsel's cross-examination of the prosecution's expert witnesses about matters outside the expert's field constituted ineffective assistance of counsel.  Petitioner states that counsel's cross-examination led to continuous sustained objections from the prosecutor.  As Petitioner did not identify the witness himself about whom he contends counsel's performance was ineffective or state why the objections establish that counsel's performance was

deficient, there is no merit to Petitioner's claim.

Conclusory allegations about counsel's performance are insufficient to raise a cognizable claim of ineffective assistance of counsel. *See Jones v. Gomez*, 66 F.3d 199, 204 (9th Cir. 1995); *Hendricks v. Vasquez*, 908 F.2d 490, 491 (9th Cir. 1990) (need specific facts in support of assertions and indication of how counsel's allegedly deficient performance prejudiced his defense); *Boehme v. Maxwell*, 423 F.2d 1056, 1058 (9th cir. 1970) ("[a]llegations of fact, rather than conclusions, are required"). Petitioner identifies no exculpatory or impeachment evidence that counsel could have revealed by further questioning of any of the prosecution's witnesses that would have produced a more favorable result at trial. Nor has Petitioner raised any plausible doubt that the jury's ultimate finding of guilt would have been different had his counsel not been objecting in this manner.

Since this court cannot speculate on what Petitioner's issue is, Petitioner has not satisfied the first prong of *Strickland*. *Strickland*, 466 U.S. at 687. Therefore, it is not necessary for this court to examine the actual prejudice prong of the *Strickland*. *Id.* at 700. He is not entitled to relief on this ineffective assistance of counsel claim.

Even if this court interprets Petitioner's claim to mean that the trial court denied him a fair trial when it prevented the line of questioning, Petitioner is not entitled to habeas relief. From this Court's examination of the record, it appears that Petitioner may be referring to the testimony of Anthony Camacho, a police evidence technician at the Oakland Police Department.

Camacho's duties include processing evidence for latent fingerprints. RT at 789. In this case, Camacho was assigned to examine the Chevy Tahoe for evidence and was able to lift two prints found on the bumper of the Tahoe. *Id.* at

820, 843.  Camacho also examined the duct tape that was found on and near Barba and was able to develop several prints.  *Id.* at 861, 863, 868-869.

Petitioner's counsel attempted to have Camacho answer a hypothetical question regarding the presence of blood on the duct tape but the trial court did not permit the question to be answered due to the lack of an adequate foundation.  RT at 876.  The exchange occurred as follows:

> [Ms. Levy]:  Now, I would like to give you a hypothetical.  If an individual is duct taped and strapped into a chair and beaten very badly so that a witness claims there's a lot of blood, would you expect more blood on the duct tape than you observed?
>
> [Prosecutor]:  Objection.  Improper hypothetical; also the witness hasn't been qualified as an expert.
>
> The Court:  Sustained.  I don't know that you laid a sufficient foundation that he has enough training and experience in that particular kind of situation where a person is taped to a chair and beaten, with more blood.
>
> [. . .]
>
> [Ms. Levy]:  And have you had experience in those cases to see how much blood is left at a scene when someone is assaulted in these particular cases?
>
> [Mr. Camacho]:  Yes.
>
> [Ms. Levy]:  And have you ever had a prior case where someone has been assaulted or beaten while in a chair?
>
> [Mr. Camacho]:  While in a chair?  Maybe car seats, quite a few, but not it – not that I can remember in a chair.
>
> [Ms. Levy]:  And in those cases where an individual has been assaulted in car seats, did you find blood all over the chair?
>
> [Prosecutor]:  I object.  It's also improper, because it doesn't indicate the severity of the beating, the type of the beating, the instrument used, or anything like that.
>
> The Court:  Given the testimony of Dr. Rogers, a person might not even bleed much.  Sustained.  I think this would be pretty speculative on his part.

RT at 876-877.

21

The trial court's exclusion of this line of questioning did not deprive Petitioner of due process. *See Taylor v. Illinois*, 484 U.S. 400, 410 (1998). First, the state had a significant interest in excluding opinion testimony that a witness is neither qualified to give nor have any reasonable basis for opinion. *See generally* Cal. Evid. Code §§ 801, 803. Second, this Court cannot conclude that further inquiry on this topic would have contributed much to Petitioner's defense that he did not participate in the murder of Barba. Whether Barba would have bled more does not prove anything with regard to Petitioner's involvement. As such, Petitioner is not entitled to relief on this claim.

### 3. Failure to call a DNA and fingerprint expert.

Petitioner asserts that his trial counsel was ineffective because she "failed to consult" a DNA and fingerprint expert. Presumably, Petitioner believes a defense expert would challenge the conclusions reached by the Prosecution's experts, who were called as witnesses to support the prosecution's theory that Petitioner killed Barba and that the murder occurred at Petitioner's residence.

Counsel's failure to call an expert witness can be grounds for an ineffective assistance of counsel claim. *See Schell v. Witek*, 218 F.3d 1017, 1028-29 (9th Cir. 2000) (counsel failed to solicit fingerprint expert where only evidence against defendant was a fingerprint). But courts have found that a trial counsel's strategic decision to forgo calling an expert and to instead rely on cross-examination of the prosecution's witness does not render counsel ineffective. *See Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999)(where the evidence does not warrant it, the failure to call an expert does not amount to ineffective assistance of counsel). And even if counsel's failure to consult and present expert testimony was unreasonable, Petitioner must show that such failure prejudiced his case. *See Richter v. Hickman*, 521 F.3rd 1222, 1230-32

22

(9th Cir. 2008).  As discussed in more detail below, this Court concludes that the decision of Petitioner's counsel to forego calling an expert did not fall below reasonable standards of care.

First, Petitioner has not provided any evidence in his petition that shows that defense counsel did not investigate the possibility of calling a DNA and fingerprint expert whose testimony would be helpful to Petitioner.  In fact, the record indicates that Petitioner's counsel did have the fingerprints to her own lab. RT at 82-83.  Second, Petitioners' counsel's cross-examination of the prosecutor's experts was thorough and competent.  Petitioner's counsel appropriately sought to raise a reasonable doubt as to when the prints were made, by establishing on cross-examination that the prints on the duct tape and print on the Tahoe could have been left by Petitioner at some earlier point in time.  *Id.* at 890, 891.  Furthermore, Petitioner's counsel questioned Anne Jancse, the expert who compared Petitioner's prints to those found, regarding the dissimilarities of the matches.  *Id.* at 1087.  Petitioner's counsel also elicited that no search was conducted for a match of the fingerprints in a computer database, *id.* at 1098, 1100, or that the age of the fingerprints could be determined.  *Id.* at 1102-1103. Petitioner has failed to establish that another expert's testimony in regard to the fingerprint and DNA matches would necessarily have been favorable to his defense.

Even if counsel was deficient under these circumstances, Petitioner's claim would fail because he has not established prejudice.  *Strickland*, 466 U.S. at 694 (prejudice occurs when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").  The Court must make this determination by considering "the totality of the evidence before the judge or jury." *Id.* at 695.  Where a state's case against

a defendant is "weakly supported by the record" the outcome of the defendant's case is "more likely to have been affected by the errors than one with overwhelming record support." *Id.* at 696.  However, nothing in this record suggests that a DNA or fingerprint expert would have testified that either (1) the DNA found on the stair runner belonged to someone other than the victim or (2) it was not Petitioner's fingerprints that were found on the duct tape or car bumper.  Instead, the overwhelming body of other physical and testimonial evidence strongly points to Petitioner's guilt.  The testimony of witnesses who saw the victim the day he disappeared and the numerous inconsistencies in Petitioner's account of his own robbery, as well as the testimony of other witnesses and experts all support the conviction.  Petitioner's speculation on possible scientific evidence trial counsel could have offered does not support a finding of a reasonable likelihood such error would have resulted in a different outcome.

### 4.       Failure to object to the prosecutor's comment during closing.

Petitioner further claims ineffective assistance based on counsel's failure to object to the prosecutor's closing argument.  Specifically, Petitioner claims counsel failed to object to the prosecutor's statement: "We do not even need to show where the murder took place, but I suspect even the defense would agree that the murder took place in the shop."  RT at 1510.

This claim is also analyzed under *Strickland*.  First, the Petitioner must show that his counsel's failure to object was objectively unreasonable.  Petitioner has made no showing that his counsel's failure to object to these comments by the prosecutor fell outside the bounds of reasonably competent professional assistance, or that he was prejudice by counsel's failure to interpose an objection.

1    This Court finds that trial counsel's decision not to object to the

2    prosecutor's comment falls squarely within the category of trial tactics and

3    counsel's actions were not objectively unreasonable.  It is likely counsel chose

4    not to object to the prosecution's rebuttal because any objection likely would

5    have focused undue attention on the prosecution's statements.  *See United States*

6    *v. Molina*, 934 F.2d 1440, 1448 (9th Cir. 1991) ("From a strategic perspective. . .

7    many trial lawyers refrain from objecting during closing argument to all but the

8    most egregious misstatements by opposing counsel on the theory that the jury

9    may construe their objections to be a sign of desperation or hyper-technicality.");

10   *see also United States v. Young*, 470 U.S. 1, 13 (1985)("[I]nterruptions of

11   arguments, either by opposing counsel or the presiding judge, are matters to be

12   approached cautiously.").  Under these circumstances, the court cannot say that

13   counsel's failure to object to the prosecution's closing argument was

14   professionally unreasonable.  *United States v. Necoechea*, 986 F.2d 1273, 1281

15   (9th Cir. 1993) (defense attorney's failure to object during closing argument to

16   prosecutor's vouching not ineffective assistance of counsel).

17   Secondly, Petitioner must also show that counsel's failure to object was

18   prejudicial and that "the result of the proceeding would have been different."

19   *Strickland*, 466 U.S. at 694; *Jackson v. Brown*, 513 F.3d 1057, 1082 (9th Cir.

20   2008) ("[E]ven if [counsel's] failure to object was deficient, we cannot find that,

21   but for his errors, there is a reasonable probability that the jury would not have

22   still convicted [petitioner].").  Petitioner has not raised any plausible doubt that

23   the jury's ultimate finding of guilt would have been different had counsel

24   objected to this statement.  Even if Petitioner's counsel did object to the

25   prosecutor's comments regarding the location of the murder, there is no

26   reasonable probability that the outcome would have been different.  The

27

28                                          25

evidence presented at trial was sufficient to convict Petitioner regardless of the prosecutor's comments.

### 5.   Failure to investigate a witness's "angry statement"

Petitioner contends that he suffered prejudice based upon an "angry statement" by a trial witness.[3]  Although Petitioner contends that defense counsel failed to properly investigate and have the witness called back for questioning, the record proves contrary.  The record in this case demonstrates that counsel did bring up the comment to the judge.  RT at 1048-1049.  Neither trial counsel, nor the judge or bailiff saw the interaction.  *Id.* at 1049-1050.  The trial judge then decided to question the jury to see if any of the jurors had seen it and if so, to deal with that person alone.  *Id.* at 1052.  However, none of the jurors saw anything.  *Id.* at 1052, 1093.  Thus Petitioner has not demonstrated that the statement had any impact on his verdict.  Thus, there is no showing of unfairness constituting a denial of due process.

### 6.   Error in overall defense strategy

Petitioner argues that counsel was ineffective for arguing that Petitioner "could only be an aider and abettor after the fact."  But, a tactical decision by counsel with which the defendant later disagrees is not a basis for a claim of ineffective assistance of counsel.  *Guam v. Santos*, 741 F.2d 1167, 1169 (9th Cir. 1984); *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981).  Tactical decisions of trial counsel deserve deference when: (1) counsel in fact bases trial conduct on strategic considerations; (2) counsel makes an informed decision based upon investigation; and (3) the decision appears reasonable under the

---

[3]Petitioner failed to specify who was the speaker of the "angry statement," however, after a review of the record this Court assumes that Petitioner's claim refers to witness Mr. Perez, whom Petitioner claimed mouthed the words "fucking asshole" to Petitioner as he left the stand.  RT at 1049.

circumstances.  *See Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).

Whether counsel's actions were indeed tactical is a question of fact considered

under 28 U.S.C. § 2254(d)(2); whether those actions were reasonable is a

question of law considered under 28 U.S.C. § 2254(d)(1).  *Edwards v.

LaMarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).

In determining whether the defendant received effective assistance of

counsel, a court "will neither second-guess counsel's decisions, nor apply the

fabled twenty-twenty vision of hindsight,' but rather, will defer to counsel's

sound trial strategy."  *Murtishaw v. Woodford*, 255 F.3d 926, 939 (9th Cir. 2001)

(quoting *Strickland*, 466 U.S. at 689).  "Because advocacy is an art and not a

science, and because the adversary system requires deference to counsel's

informed decisions, strategic choices must be respected in these circumstances if

they are based on professional judgment." *Strickland*, 466 U.S. at 681

Based upon this court's review of the record, it appears that counsel made

a reasonable tactical decision to ask the jury to find Petitioner guilty of accessory

after the fact, given the extent of the physical evidence implicating Petitioner and

presumably recognizing that there was little, if any, chance that the jury would

conclude that Petitioner had not participated in Barba's demise.  At trial, the jury

heard two different theories explaining the evidence.  From the state, the jury

heard that Petitioner was an active and willing participant in the murder of

Barba, RT at 1493, the murder occurred in the course of a robbery, *id.* at 1501,

and Barba was bound and tortured.  *Id.* at 1492.  From the defense, the jury heard

that the only things connecting Petitioner to the death of Barba was his name on

the lease, *id.* at 1543, and that he is cousins with the buyer of Barba's drugs.  *Id.*

at 1548.  However, in needing to explain Petitioner's fingerprints on the duct

tape and the suspect fire at his store, Petitioner's counsel argued that Petitioner

1   was at most involved in covering up the murder.  *Id.*  This strategic decision was

2   not clearly unreasonable under the circumstances.

3          Judicial scrutiny of counsel's performance is highly deferential, and this

4   Court finds that counsel's conduct falls within the wide range of reasonable

5   professional assistance.  *See Strickland*, 466 U.S. at 689 (tactical decisions which

6   are objectively reasonable cannot form the basis of an ineffective assistance of

7   counsel claim).  In the absence of any evidence to the contrary, this Court cannot

8   say that counsel's strategy to argue for a "lesser included" crime of accessory

9   after the fact constitutes ineffective assistance of counsel.  In addition, Petitioner

10  makes no effort to explain how presenting this theory prejudiced him during trial.

11  There is no merit to this claim.

12  **III.     Ineffective Assistance of Appellate Counsel.**

13         Petitioner asserts that his appellate counsel rendered ineffective assistance

14  on the grounds that appellate counsel 1) failed to challenge the ineffective

15  assistance of counsel claims; and 2) failed to challenge the sufficiency of the

16  evidence supporting the murder charge.

17         **A.     Legal Standard**

18         The Due Process Clause of the Fourteenth Amendment guarantees a

19  criminal defendant the effective assistance of counsel on his first appeal as of

20  right.  *See Evitts v. Lucey*, 469 U.S. 387, 391-405 (1985).  Claims of ineffective

21  assistance of appellate counsel are reviewed according to the standard set out in

22  *Strickland*.  *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989); *United States*

23  *v. Birtle*, 792 F.2d 846, 847 (9th Cir. 1986).  A defendant therefore must show

24  that counsel's advice fell below an objective standard of reasonableness

25  ("performance prong") and that there is a reasonable probability that, but for

26  counsel's unprofessional errors, he would have prevailed on appeal ("prejudice

27

28                                        28

prong"). *Miller*, 882 F.2d at 1434 & n.9 (citing *Strickland*, 466 U.S. at 688, 694; *Birtle*, 792 F.2d at 849). The *Strickland* framework for analyzing ineffective assistance of counsel claims is considered to be "clearly established Federal law, as determined by the Supreme Court of the United States" for the purposes of 28 U.S.C. § 2254(d) analysis. *See Taylor*, 529 U.S. at 404-08.

Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by defendant. *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1045 (9th Cir. 1997); *Miller*, 882 F.2d at 1434 n.10. The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. *See id.* at 1434 (footnote and citations omitted). Appellate counsel therefore will frequently remain above an objective standard of competence and have caused his client no prejudice for the same reason--because he declined to raise a weak issue. *See id.*

### B.     Analysis

Because Petitioner's claim that his trial counsel was ineffective for failing to suppress Mercy's testimony is without merit, it therefore follows that his appellate counsel was not ineffective for failing to raise that issue or an ineffective assistance of trial counsel claim based on that issue on appeal. *See Strickland*, 466 U.S. at 687-88 (requiring a showing of deficient performance as well as prejudice).

Petitioner also asserts that appellate counsel was ineffective for failing to challenge the sufficiency of the evidence for the murder conviction. Appellate counsel does not have a constitutional duty to raise every non-frivolous issue requested by defendant. *See Jones*, 463 U.S. at 751-54; *Gerlaugh*, 129 F.3d at 1045; *Miller*, 882 F.2d at 1434 n.10. Here, ample evidence supported Petitioner's

conviction for murder.  Because the evidence supporting Petitioner's murder conviction is substantial, it cannot be said that appellate counsel's failure to challenge the sufficiency of the evidence for such conviction constitutes deficient performance.  *See Miller*, 882 F.2d at 1434 (the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy).

Because there is no merit or entitlement to relief on Petitioner's ineffective assistance of counsel or cumulative error claims, appellate counsel could not have been ineffective for failing to raise them on direct appeal.

### CONCLUSION

The state court's denial of Petitioner's habeas petition is not contrary to or an unreasonable application of established federal law determined by the Supreme Court.  Therefore, Petitioner's claims are DENIED.  The Clerk shall enter judgment and close the file.

IT IS SO ORDERED.

DATED: November 2, 2009

JEFFREY S. WHITE
United States District Judge